J-S18031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| JODIE LYNNE TIERNEY | : | No. 1484 MDA 2017 |

Appeal from the Judgment of Sentence August 29, 2017
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003922-2016

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JODIE LYNNE TIERNEY | : | |
| Appellant | : | No. 1610 MDA 2017 |

Appeal from the Judgment of Sentence August 29, 2017
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003922-2016

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: MAY 22, 2019**

A jury convicted Jodie Lynne Tierney ("Appellant Tierney")[1] on two

counts of endangering the welfare of children, two counts of involuntary

---

[1] As discussed *infra*, we recognize both parties appealed in this case; however, for the ease of discussion, we shall refer to Jodie Lynn Tierney as "Appellant Tierney."

---

*   Former Justice specially assigned to the Superior Court.

manslaughter, one count of corruption of minors, and one count of selling or furnishing liquor to minors.[2]  Thereafter, the Court of Common Pleas of York County imposed an aggregate sentence of thirty months to seventy-two months in prison, to be followed by twelve months of probation. The Commonwealth filed a timely notice of appeal challenging the legality of Appellant Tierney's sentence, and we docketed the appeal at 1484 MDA 2017.[3] Appellant Tierney filed a timely cross-appeal presenting issues related to her convictions and sentence, and we docketed the appeal at 1610 MDA 2017. This Court consolidated the appeals, and after a careful review, we affirm Appellant Tierney's convictions but vacate her judgment of sentence and remand solely for resentencing.

The relevant facts and procedural history are as follows: Appellant Tierney was arrested in connection with the death of two teenage boys, and represented by counsel, she proceeded to a jury trial on July 10, 2017.  At trial, Matthew Edward Dietrich, who is a paramedic, testified that, on June 16, 2015, at 7:11 p.m., he was dispatched in response to a 911 call for a vehicle

---

[2] 18 Pa.C.S.A. §§ 4304, 2504, 6301, and 6310, respectively.

[3] Specifically, as further discussed *infra*, the Commonwealth challenges whether the trial court properly merged Appellant Tierney's convictions for involuntary manslaughter with her convictions for endangering the welfare of children for sentencing purposes.  We note the Commonwealth is permitted to appeal, as of right, the legality of sentence.  42 Pa.C.S.A. § 9781(a).

crash with a fire on Slab Road, which is a windy country road. N.T., 7/11/17-7/14/17, at 156, 180.[4] The scene of the accident was approximately three miles from his department's location, and he arrived at the scene at 7:15 p.m. *Id.* at 157.

Upon arrival, Paramedic Dietrich "observed a passenger vehicle that was overturned in the grass next to a utility pole and it was fully involved in fire." *Id.* at 158. The paramedic noted he arrived at the scene at the same time as the fire chief, who had arrived in his personal vehicle. *Id.* Paramedic Dietrich testified that neither he nor the fire chief had equipment with them to put out the fire, so they could only stand by and wait for the fire engines to arrive, which occurred four to seven minutes later. *Id.* at 158-59.

Within minutes of arrival, the fire department extinguished the fire, and Paramedic Dietrich observed the vehicle was overturned and two bodies were inside the vehicle. *Id.* at 162. "One of the occupants was partially ejected whereas part of his body was hanging out [of] the window. And the other occupant was close-by, laying near him inside the vehicle….[T]hey were in the front passenger side window [area]." *Id.*

Pennsylvania State Police Corporal Sean Taylor testified he responded to the 911 call and, by the time he arrived at the scene, the fire was extinguished, and he was informed that two deceased individuals were inside

---

[4] The pagination of the notes of testimony from July 11, 2017, to July 14, 2017, is continuous.

of the vehicle. *Id.* at 165. Corporal Taylor noted there was no evidence any other vehicle was involved in the crash, and there was no sign the occupants had consumed alcohol while in the vehicle. *Id.* at 166. He noted he had no information at this time as to whether the driver had been consuming alcohol prior to the crash. *Id.* Corporal Taylor testified the car involved in the crash was a Toyota 4Runner, the deceased driver was identified as a seventeen-year-old male, S.H., and the deceased passenger was identified as a sixteen-year-old male, N.M. *Id.* at 167-68.

York County Deputy Coroner Jeffri Goodfellow testified he responded to the crash scene, and he confirmed that upon his arrival two extensively burned bodies were inside of the vehicle. *Id.* at 207-08. He testified that, based on his observation of the accident scene and information provided to him, as well as the size of the bodies and the unburnt clothing, he determined that S.H. was the driver while N.M. was the passenger. *Id.* at 218-20. He testified he did not conduct an autopsy on the bodies; however, based on the vehicle's significant impact with a utility pole and the fact witnesses heard no sounds coming from the vehicle as it burned, Deputy Coroner Goodfellow concluded the victims died from "multiple blunt force trauma." *Id.* at 225.

Deputy Coroner Goodfellow testified that, as is protocol with incidents involving vehicular fatalities, the Coroner's Office conducted a blood draw of S.H. to determine whether he had been driving while under the influence of alcohol or a controlled substance. *Id.* at 222. Specifically, Michele Kirchner,

who was a part-time deputy coroner and morgue assistant, testified she drew blood from S.H.'s heart at the morgue. *Id.* at 264-65. Jennifer Okraska, the division director of the chemistry and toxicology department of the Department of Health Bureau Labs, confirmed she tested S.H.'s blood sample, which was submitted by the Coroner's Office. *Id.* at 241-42. She testified S.H.'s blood alcohol content was .094%. *Id.* at 247.

C.M., who was seventeen years old at the time of the incident, testified that he was friends with Appellant Tierney's teenage son, S.T. *Id.* at 287. He testified that he, S.T., S.H., N.M., N.A., and D.G. "hung out" together, and he referred to them as "the common core group" of boys. *Id.* at 288, 290. C.M. testified the first time he "hung out" at the Tierney residence was Christmas night of 2014; however, from that point until the date of the accident, he, along with the common core group of boys, spent most weekends at the Tierney home. *Id.* at 288-90.

C.H. testified he consumed alcohol while at the Tierney home on "probably eight to ten" occasions. *Id.* at 293. The first time he consumed alcohol at the Tierney home was in January of 2015. *Id.* at 294. He noted that, during various weekends in January of 2015, S.H. brought beer in a duffle bag and gave it to the teens in the basement. *Id.* at 294-96. During these times, Appellant Tierney was upstairs in the living room or in her bedroom. *Id.* at 296.

He noted that the teens, as well as their music, were "loud" on these occasions, but Appellant Tierney did not come into the basement to check on the teens. *Id.* at 298. He testified that, since neither Appellant Tierney nor her husband checked on the teens, they left the alcohol out in the open in the basement and did not attempt to conceal it. *Id.* C.H. testified that, near the end of January of 2015, teenage girls started joining the boys at the Tierney home, and they would all "drink in the basement." *Id.* at 299. He noted the teen boys and girls videotaped themselves drinking alcohol and "doing body shots."[5] *Id.* at 300.

At this point, the Commonwealth played a video, which C.H. confirmed was recorded in the Tierneys' basement in 2015. *Id.* at 302-03. In the video, C.H. poured alcohol into a teenage female's belly button, and N.M. drank the alcohol therefrom. *Id.* at 303. The video depicted other teenage boys pouring alcohol into the belly buttons of teenage girls, and Appellant Tierney's son, S.T., was in the video. *Id.* at 305. Additionally, the video confirmed loud music was playing and S.H. was making a loud barking noise. *Id.* at 307. C.H. testified Appellant Tierney was home; however, she never checked on the teens in the basement, and the teens had no concerns about "getting caught." *Id.* He noted that neither Appellant Tierney nor her husband ever

_____

[5] C.H. described a "body shot" as "[b]asically pour[ing] liquor into a belly button and then somebody else sucks it out." *Id.* at 300.

- 6 -

collected the teens' car keys, and the teens' ability to drive away from the home at any point was not restricted. *Id.* at 308.

C.H. testified that sometime between December 25, 2015, and June 16, 2015, he went with the Tierney family to their cabin in Adams County. He indicated D.G., N.A., and C.S. also accompanied the family, which included Appellant Tierney, her husband, and her two sons. *Id.* at 309. As they ate at a nearby pizza shop, S.T. asked his mom, Appellant Tierney, to purchase a twelve pack of beer for the boys, and Appellant Tierney obliged. *Id.* at 310. Specifically, Appellant Tierney purchased the beer and then handed it to S.T. *Id.* C.H. testified that, back at the cabin, the teenage boys drank the beer while sitting around the fire pit. *Id.* at 312.

C.H. testified Appellant Tierney purchased alcohol for the common core group of boys on two other occasions. *Id.* Specifically, on one occasion, there were many boys in the Tierneys' basement, and they "pulled [their] money together…roughly like a hundred dollars." *Id.* at 315. C.H. testified Appellant Tierney used the money to purchase "[t]wo 30 packs of Busch, 12 pack of Four Lokos, and two 12 packs of Redd's Apple Ale." *Id.* He indicated that he drank a beer "in front of" Appellant Tierney and her husband, who were also in the basement; Appellant Tierney's husband drank a Redd's Apple Ale. *Id.* at 317.

He noted the boys did not attempt to conceal their drinking from Appellant Tierney or her husband. *Id.* He also noted that many of the boys,

including himself, drove their own vehicles to the residence, and neither Appellant Tierney nor her husband took their keys or ensured the boys would not drive away from the house. *Id.* at 318. C.H. confirmed that he drank until he felt intoxicated, other teenage boys appeared to be visibly intoxicated, and Appellant Tierney's son, S.T., vomited after consuming alcohol. *Id.* at 319. C.H. did not observe Appellant Tierney or her husband tend to S.T. during or after he vomited. *Id.*

C.H. testified Appellant Tierney also purchased alcohol for the teenage boys on Mother's Day of 2015. Specifically, she asked C.H., N.M., N.A., D.G., and S.T. to do yardwork and, in exchange, she gave them Redd's Apple Ale and chicken. *Id.* at 320. He noted that he drank the Redd's Apple Ale in front of Appellant Tierney. *Id.* at 321. She did not ask him to stop drinking, and he later drove himself home. *Id.*

C.H. testified that, on June 15, 2015, he arrived at the Tierney house late in the evening. *Id.* at 323. Numerous teenage girls and boys, including S.H., N.M., and Appellant Tierney's son, S.T., were already at the house. *Id.* Some of the teenagers were by the outside fire pit while others were in the basement. *Id.*

C.H. testified that, when he arrived, the teenagers were not drinking alcohol, but at around 9:00 p.m., S.H. left to obtain alcohol. *Id.* at 326. When S.H. arrived back at the Tierneys' house, S.H. had an 18 pack of Bud Light pounders and raspberry Seagram's. *Id.* at 327. C.H. noted that, on

approximately six other occasions, S.H. had brought alcohol to the Tierney home. *Id.* at 326. C.H. noted that a teenage girl had brought a bottle of Seagram's to the Tierney house that evening, and Appellant Tierney's son, S.T., brought out a pint size bottle of rum. *Id.* at 334. Appellant Tierney was home as the teenagers drank the alcohol on June 15, 2015. *Id.* at 329. C.H. noted the teenagers left empty "cans or bottles" of alcohol lying around the basement. *Id.* at 330.

C.H. testified he went to sleep at the Tierney house at around midnight, and he awoke on June 16, 2015, at around 9:00 a.m. *Id.* at 335. At this point, S.H., N.M., N.A., and Appellant Tierney's younger son were at the Tierney house. *Id.* He noted that neither Appellant Tierney, her husband, nor her older son, S.T., were at the house when he awoke; however, he and the other boys "hung around" as they were always welcome at the Tierney house. *Id.* at 337.

C.H. testified the teenage boys (S.H., N.M., N.A., and himself) started drinking again soon after they woke up, and they left the Tierney house at around noon to purchase chewing tobacco. *Id.* at 338. C.H. testified S.H., who had been drinking, drove his car to the store. *Id.* at 339. After purchasing the chewing tobacco, the boys returned to the Tierney residence where they again began drinking alcohol and swam in the pool. *Id.* at 341-42. C.H. testified he observed S.H. consume beer and at least four or five shots of rum during this time. *Id.* at 345-47. C.H. testified N.A. also drank

rum during this time, and he became very sick, so the boys took him to S.T.'s bed. *Id.* at 348.

C.H. testified the boys became hungry, so he, S.H., and Appellant Tierney's younger son went to the supermarket. *Id.* at 350. C.H. indicated S.H. drove his 4Runner. *Id.* at 355. After getting food, the boys returned to the Tierney residence, where they discovered N.A.'s dad, N.A.'s sister, Appellant Tierney, and Appellant Tierney's husband. *Id.* N.A.'s dad was "talking" to Appellant Tierney and her husband, as well as taking pictures of his son, who was "basically unconscious." *Id.* at 355-56. C.H. overheard Appellant Tierney say "she thought she was going to have to call an ambulance for [N.A.]." *Id.* at 355. N.A.'s dad, S.H., and N.M. lifted N.A. off the bed and carried him to the car while Appellant Tierney and her husband watched. *Id.*

C.H. testified he, S.H., and N.M. traveled in the car with N.A.'s dad driving, and they helped to carry N.A. into his house. *Id.* Later, D.G., who had been working, picked up C.H., S.H. and N.M., and they all went back to the Tierney residence. *Id.* at 359. Appellant Tierney was home, but she never asked the boys about N.A. *Id.* at 360.

Within ten to fifteen minutes, at approximately 6:30 p.m., S.H.'s dad texted him and asked him to come home to do chores. *Id.* at 360-61. S.H. and N.M. then left the Tierney residence. *Id.* at 361. C.H. remained at the Tierney residence approximately fifteen minutes longer, and then he left. *Id.* at 361-62. He testified Appellant Tierney did not speak to him during this

time, did not try to take his keys, and did not call C.H.'s parents. *Id.* at 362. He noted the boys had not cleaned up the visible empty alcohol containers from that day. *Id.* at 364.

Tammy Heffner testified that she is C.H.'s mother, and she expected that when he was at the Tierney residence he was being properly supervised by Appellant Tierney and her husband. *Id.* at 445. She indicated she did not give her son permission to consume alcohol, she was unaware that he was consuming alcohol at the Tierney residence, and he would have been "in trouble" had she been aware. *Id.* at 449-52.

Tina Hill testified that S.H. was her only child, and she was under the impression that he was being supervised when he was at the Tierney residence. *Id.* at 461-62. Mrs. Hill confirmed that she gave S.H. permission to stay at the Tierney residence on June 15 and 16, 2015, but she was not aware that he was consuming alcohol. *Id.* at 466. Mrs. Hill noted Appellant Tierney never informed her the teenagers were drinking at the Tierney house. *Id.* She indicated S.H. would have been "in trouble" if she had known he was consuming alcohol. *Id.* at 499.

Robert Glenn Hill testified that S.H. was his son, and his 4Runner had been repaired on June 14, 2015. *Id.* at 507.

T.S., who was eighteen years old at the time of the accident, testified she was the Tierneys' neighbor. *Id.* at 511. She testified she used to "hang out" at the Tierney home, and "under twelve times" she saw "children"

consuming alcohol in the basement. *Id.* at 513-14. She specifically testified she saw Appellant Tierney's son (S.T.), C.H., D.G., S.H., N.M., and N.A. consume alcohol at the Tierney home. *Id.*

T.S. indicated she was present at the Tierney home in April of 2015, when S.T. and N.A. drank so much alcohol they vomited. *Id.* at 519-20. T.S. described the typical demeanor of the drinking parties at the Tierney house to be "out of control" and "wild." *Id.* at 538. She opined that she drank alcohol at the Tierney home on "four or five" occasions. *Id.* at 537.

T.S. testified Appellant Tierney was present in the house when the teens were drinking, but she never asked them to leave. *Id.* at 521. She noted that, on one occasion, Appellant Tierney collected the teenagers' car keys so that they could not drive after drinking at the house. *Id.* at 522. T.S. testified that, in May or June of 2015, Appellant Tierney indicated to her that S.T.'s girlfriend was coming to the house, and she asked T.S. what kind of "fruity drinks" girls like to drink. *Id.* at 528.

Bryan Tracey testified he was N.M.'s stepfather, and N.M. had been at the Tierney residence the night before and day of the accident. *Id.* at 542. He noted N.M. was not "allowed" to drink alcohol, and Appellant Tierney had never informed him that N.M. was drinking alcohol at the Tierney residence. *Id.* at 544.

Carol Tracey testified she was N.M.'s mother, and she confirmed N.M. had been at the Tierney house on the day of the accident. *Id.* at 547. She

indicated N.M. was a friend of Appellant Tierney's son, S.T. *Id.* at 548. Mrs. Tracey testified that N.M. often spent weekends at the Tierney house, and "[a]lmost every time," Mrs. Tracey would confirm with Appellant Tierney whether it was "ok" for N.M. to stay at the house. *Id.*

Mrs. Tracey indicated she did not permit N.M. to consume alcohol. *Id.* at 550. She noted that, in January or February of 2015, Mr. Tracey overheard N.M. mention that he was drinking. *Id.* In response, Mrs. Tracey telephoned Appellant Tierney and "specifically asked if there was drinking or anything going on at the house." *Id.* Appellant Tierney answered, "No, never." *Id.* Mrs. Tracey testified that, if she had known her son was drinking alcohol at the Tierney residence, "[h]e would have been forbidden to go." *Id.* at 551.

D.G., who was seventeen years old at the time of the accident, confirmed that, from the winter of 2014 until June of 2015, he often spent weekends at the Tierney residence, along with S.H., C.H., N.A., and N.M. *Id.* at 566. He testified that "[a]lmost every time" he was at the Tierney house he would consume alcohol. *Id.* at 568. He noted that the "[m]ajority of the time" the alcohol was at the house when he arrived; however, "[Appellant Tierney] bought for [them] on occasions." *Id.* D.G. indicated that sometimes other teenagers would join them, and there would be ten to fifteen teenagers consuming alcohol in the basement. *Id.*

D.G. noted that, when he was at the Tierney residence, Appellant Tierney was often in the living room, the boys were "loud," and she had

observed D.G. consuming alcohol at the house. *Id.* at 571, 576. He noted that on one occasion Appellant Tierney "yelled" at the boys for not cleaning up the empty beer cans; however, to his knowledge, Appellant Tierney never called his parents to report he had been drinking alcohol at the Tierney house. *Id.* at 572-73.

D.G. testified that, after it became clear Appellant Tierney knew the boys were drinking alcohol, they did so openly and carried alcohol into the basement without trying to hide it. *Id.* at 576. He opined that the "majority of the time" he was at the Tierney house, he and the other boys were "drunk to the point of intoxication[.]" *Id.* at 576-77. D.G. testified that, after consuming alcohol, he would sometimes drive away from the Tierney house in the late night or early morning hours to go to a convenience store for food. *Id.* at 577. He observed other boys, including S.H. and C.H., do the same thing. *Id.* He noted Appellant Tierney never asked the boys for their car keys. *Id.*

D.G. recounted that, sometime between December of 2014 to June 16, 2015, he accompanied the Tierneys on a trip to their cabin. *Id.* at 582. He testified the boys had some leftover alcohol in the Tierneys' basement, and Appellant Tierney took it to the cabin. *Id.* After they arrived at the cabin, he, as well as the other teenage boys who were at the cabin, consumed the alcohol, so Appellant Tierney bought more alcohol for them at a pizza store. *Id.* at 582-86.

Moreover, D.G. recounted that, one night the boys "were all hanging out like we always do [at the Tierney home] and decided that we wanted to have a party that night." *Id.* at 587. They asked Appellant Tierney if she would buy alcohol for them, and she indicated affirmatively. *Id.* The boys "pooled their money," and D.G., N.A., N.M., and S.T. went with Appellant Tierney to the beer distributor to purchase the alcohol. *Id.* at 588. He noted that Appellant Tierney used her own money to purchase two bags of chips for the party. *Id.* at 589.

Upon return to the Tierney home, the boys carried the alcohol straight down to the basement. *Id.* at 590. Appellant Tierney and her husband joined the party, which now included twelve to fifteen male and female teenagers, and consumed alcohol. *Id.* at 588-90. D.G. indicated Appellant Tierney's teenage son, S.T., drank so much alcohol that evening that he vomited on the carpet. *Id.* at 595. D.G. noted that he had driven himself to the Tierney home that evening, no one asked for his car keys, and no one placed any restrictions on his ability to leave the Tierney house. *Id.* at 592.

D.G. further recounted that, on Mother's Day in 2015, he, N.A., N.M., S.H., C.H., and S.T. did yardwork for Appellant Tierney and, in exchange, she gave them a case of beer and fried chicken. *Id.* at 596. D.G. specifically testified that Appellant Tierney gave him permission to drink the beer. *Id.* at 597. He noted that he later drove himself home, and he never told his parents that he had been consuming alcohol at the Tierney house. *Id.* at 599.

D.G. indicated that, on June 15, 2015, he arrived at the Tierney house at approximately 6:00 p.m., and S.T., S.H., N.M., and C.H. were already at the house. *Id.* at 603-04. Later that night, approximately ten to fifteen teenagers joined them, and S.H. bought two cases of beer. *Id.* at 605. He also noted the Tierneys' refrigerator contained alcohol left over from Mother's Day and the teenagers were drinking the alcohol. *Id.* Appellant Tierney was in the living room as the teenagers partied in the basement, garage, and outside. *Id.* at 605-06.

D.G. spent the night at the Tierney house and left at 7:00 a.m. on July 16, 2015. *Id.* at 609. He later saw C.H., S.H., and Appellant Tierney's youngest son at a grocery store, and they reported N.A. had consumed so much alcohol that he was "passed out" at the Tierney house. *Id.* at 611. D.G. went to N.A.'s home at around 4:00 p.m. *Id.* at 614. He indicated N.A. was so intoxicated he was "mumbling and making weird grunts," and N.A.'s mother and sister were very upset. *Id.*

D.G. testified he then returned to the Tierney residence, and he later saw S.H. and N.M. leave the house together. *Id.* at 615. D.G. testified that, sometime from the winter of 2014 to June 15, 2015, he heard Appellant Tierney's husband tell Appellant Tierney that the teenagers' drinking "had to stop;" however, Appellant Tierney did not respond. *Id.* at 622.

Kelly Gurreri, who is D.G.'s mother, confirmed that, from December of 2014 to June of 2015, her son stayed at the Tierney residence approximately

every other weekend. *Id.* at 702. It was her understanding that Appellant Tierney and her husband were "supervising the boys" while they were at their house. *Id.* The Tierneys never informed her that they permitted drinking at their home, and more specifically, she was unaware that her son had been consuming alcohol at the Tierney home. *Id.* at 703-04.

C.S., who was seventeen years old at the time of the accident, testified he went to the Tierney house approximately four or five times, and each time, he consumed alcohol in the basement. *Id.* at 711-12. He noted Appellant Tierney was usually upstairs during this time, and the teenagers were "loud." *Id.* at 713. He confirmed that he accompanied other boys to the Tierney cabin, and Appellant Tierney purchased beer for them at a pizza shop. *Id.* at 718. He noted Appellant Tierney was present when he consumed the beer. *Id.* at 719-20.

Laura Shane, who is C.S.'s mother, confirmed her son stayed at the Tierney residence "five to eight times," and she "figured that the parents were there watching the boys." *Id.* at 732-33. She was not aware that the teenagers, including her son, were consuming alcohol while they were at the Tierney residence. *Id.* at 733.

B.H., who was seventeen years old at the time of the accident, testified that, from December of 2014 to June of 2015, he was at the Tierney house "seven to ten times," and "all the kids" drank alcohol "every time" he was there. *Id.* at 738. Usually, the teenagers consumed alcohol while in the

basement; he testified Appellant Tierney came to the basement on occasion and observed them drinking alcohol but did not tell them to stop. *Id.* at 739-41. He confirmed that, sometimes, teenagers who had been drinking alcohol at the Tierney house would drive away for a period, but they would then return. *Id.* at 741-42.

Everet Haight, Jr. testified he is B.H.'s father, he did not permit B.H. to drink alcohol, and the Tierneys did not make him aware that B.H. was consuming alcohol at their residence. *Id.* at 747.

M.B., who was fifteen years old at the time of the accident, testified she went to the Tierney house on approximately five occasions, and she consumed alcohol once. *Id.* at 754. However, every time she was at the Tierney home, she saw other teenagers consuming alcohol. *Id.* at 755. She noted Appellant Tierney was home, but she never said anything to the teenagers about the alcohol. *Id.* at 757. M.B. indicated that she had observed teenagers, including S.H., drive away from the Tierney home, and they were "tipsy." *Id.* at 762.

C.G., who was fifteen years old at the time of the accident, testified she went to the Tierney house on June 15, 2015, at approximately 10:00 p.m. *Id.* at 774. She observed S.H. drinking alcohol. *Id.* at 778. Erin Griffin, who is C.G.'s mother, testified that she assumed the Tierneys were supervising the teenagers on June 15, 2015, and she was unaware other teenagers were consuming alcohol. *Id.* at 793.

C.R. indicated that, on June 16, 2015, at approximately 3:45 p.m., she received a call from N.M. indicating that her younger brother, N.A., was drunk. *Id.* at 795. She met her father at the Tierney home where they discovered her brother in a non-responsive state. *Id.* at 797. At some point, the Tierneys arrived, and S.H., along with N.M., carried her brother to her father's car. *Id.* at 799. C.A. testified her parents' concern about her brother was "pretty high." *Id.* at 802.

Joseph Argento, Jr., who is N.A.'s father, testified he was unaware that his son was consuming alcohol at the Tierney home. *Id.* at 818. He confirmed he went to the Tierney house on June 16, 2015, and discovered his son was extremely intoxicated. *Id.* at 822. He asked S.H. what was "going on," and S.H. reported that N.A. had "guzzled a half bottle of rum." *Id.* at 824.

As Mr. Argento attempted to rouse his son, the Tierneys entered the room. *Id.* Appellant Tierney's husband, who appeared to be nervous and scared, apologized for the condition of N.A., and turning to Appellant Tierney, he said, "This has got to stop." *Id.* at 825-28. Appellant Tierney did not respond. *Id.* at 830. Mr. Argento then assisted in putting N.A. in the car and drove him home. *Id.* at 829.

Shari Argento, who is N.A.'s mother, testified that, prior to the accident, she went to the Tierneys' house to introduce herself. *Id.* at 856. She saw five-gallon jugs of wine on the counter and, concerned for her son's well-being, she asked Appellant Tierney whether the teenagers were allowed to

drink the wine. *Id.* at 857. Appellant Tierney indicated negatively. *Id.* She indicated Appellant Tierney took her to the basement, where teenagers were playing pool and video games. *Id.* Mrs. Argento testified that, at this time, she specifically asked Appellant Tierney whether the teenagers were allowed to drink alcohol, and Appellant Tierney said, "No." *Id.* at 858. Mrs. Argento testified she was comfortable permitting her son to stay at the Tierneys' home because Appellant Tierney indicated she would not permit the teenagers to drink alcohol. *Id.*

Mrs. Argento testified that, on June 16, 2015, when her husband brought N.A. home from the Tierney residence, N.A. was visibly intoxicated. *Id.* at 861. She noted that Appellant Tierney never texted or telephoned her with regard to the incident. *Id.*

N.A., who was sixteen years old at the time of the accident, confirmed he spent many weekends at the Tierney house in the months leading up to the accident, and he consumed alcohol. *Id.* at 872-73. He testified that other teenage boys, including S.H. and N.M., stayed at the residence on a regular basis, and they all consumed alcohol. *Id.* at 872-75. He confirmed Appellant Tierney purchased alcohol for the group of teenagers on two or three occasions. *Id.* at 876-77, 894. He also confirmed that, on at least one occasion, Appellant Tierney joined the teenagers in the basement after she purchased alcohol for them. *Id.* at 888.

N.A. confirmed he was at the Tierneys' home during the evening of June 15, 2015, and into the afternoon of June 16, 2015. He confirmed the teenagers were consuming alcohol during the evening of June 15, 2015, and he awoke at the Tierney home at approximately 9:00 or 10:00 a.m. on June 16, 2015. *Id.* at 903. N.A. indicated he, N.M., S.H., and C.H. were still at the house at this time. *Id.* He confirmed he drank a lot of rum on June 16, 2015, as did S.H. *Id.* at 913-17. N.A. noted the Tierneys permitted him to consume alcohol while he was at their house, and they had no rules. *Id.* at 949.

Sylvia Frey testified that she has a teenage son who was friends with Appellant Tierney's older son, S.T. *Id.* at 958. She indicated she exchanged Facebook messages with Appellant Tierney on June 24, 2015, which was after the fatal accident. *Id.* at 967. In the messages, Mrs. Frey asked Appellant Tierney if she could talk to her because she had concerns about Snapchat and Facebook messages she had read about the accident. *Id.* at 968. Appellant Tierney replied, "Jeez. That's crazy." *Id.* Appellant Tierney then asked Mrs. Frey if she could send her copies of the messages. *Id.* Appellant Tierney assured Mrs. Frey that S.H. and N.M. were not drinking alcohol at her house, the boys were not drunk, toxicology reports came back negative, and the boys were in an accident because they "were taking selfies, being goofy[.]" *Id.* at 969. Mrs. Frey later provided the Facebook messages to the police.

Pennsylvania State Police Corporal John Colarusso testified he was the criminal investigator assigned to the accident. N.T., 7/17/17-7/18/17, at 5.[6] He indicated there were no signs of alcohol consumption at the scene of the crash; however, his investigation revealed S.H. had been drinking on the day of the accident. *Id.* at 7, 12.

The toxicology results confirmed S.H.'s blood alcohol content was .094%. *Id.* at 15. He noted he reviewed S.H.'s Snapchat logs, which revealed images and video files from June 15 and 16, 2015. *Id.* at 21-22. One of the videos, taken on June 16, 2015, at 1:53 p.m., showed S.H. drinking "a shot of clear liquid" and making a statement that he is "live on Jackass[.]" *Id.* at 28. He noted that, after 4:06 p.m., on June 16, 2015, there is no indication S.H. viewed any items through his Snapchat account. *Id.* at 35. Corporal Colarusso indicated that, on June 13, 2015, S.H.'s Toyota 4Runner was serviced. *Id.* at 37. He also noted that the last text message S.H. responded to was on June 16, 2015, at 7:02 p.m. *Id.* at 103.

Corporal Colarusso testified that, during his investigation, he received anonymous tips of teenage boys drinking alcohol at the Tierney house, and he received Snapchat videos of the boys drinking on June 16, 2015. *Id.* at 55.

Andrew Thierwechter, an expert in accident reconstruction who worked for the Pennsylvania State Police, indicated the evidence was consistent with

---

[6] The pagination of the notes of testimony from July 17, 2017, to July 18, 2017, is continuous.

S.H., as opposed to N.M., being the driver of the 4Runner. *Id.* at 249. He testified there was no evidence that S.H. applied his car's brakes prior to the car's impact with the utility pole. *Id.* at 150-51. He indicated the evidence revealed S.H. lost control of the car as he was maneuvering around a curve, and he "excessively steered" in an attempt to regain control prior to impact. *Id.* at 157, 169.

Mr. Thierwechter noted the crash occurred on a "warm sunny" day, so there was no indication weather was a causal factor in the crash. *Id.* at 175. He also noted there was no evidence that another car was involved in the accident, that S.H. was texting at the time of the accident, or that S.H.'s 4Runner had any mechanical issues. *Id.* at 17, 241-45.

Taking into consideration S.H.'s blood alcohol content of .094%, Mr. Thierwechter opined this factor made it "52 times more likely" that a male who was "16 to 20" years old would be involved in a fatal crash than a "sober male in that age group." *Id.* at 180. He explained alcohol impairs judgment and tends to increase a young male's driving speed. *Id.* at 182-83. He further explained alcohol reduces coordination, thus impairing the ability to steer and brake at the same time, and alcohol impairs driving perception. *Id.* at 193-94. Mr. Thierwechter specifically opined, to a reasonable degree of scientific certainty, that S.H.'s alcohol impairment was a causal factor in the crash. *Id.* at 193.

At this point, the Commonwealth rested and Appellant Tierney presented her case. Specifically, Appellant Tierney presented the testimony of Lawrence Guzzardi, M.D., who is a medical toxicologist and board certified in emergency medicine. Dr. Guzzardi testified that he questioned the validity of the sample of blood taken from S.H., which was used to determine S.H.'s blood alcohol content. *Id.* at 302. Specifically, he testified:

> [T]he specimen of blood that was taken wasn't taken from the femoral artery or vein. It, in fact, wasn't taken under direct visualization of the heart as we typically would do in an autopsy. It was done in a very unusual manner. That unusual manner makes the question of the validity of that sample in question.
>
> ***
>
> [T]he nature of how this specimen was collected allegedly by direct observation of the heart through an incision into the thorax or a slit into the thorax, I just can't even visualize the anatomy that would allow you to do that, because there is a lung in there. I do not know, but [I] do not have any information that the lung was in fact pushed aside in order to get to the heart. So if the heart was able to be seen when you just look into the chest, something is terribly array.

*Id.*

He noted that, since an autopsy was not performed, it was impossible to know the nature of S.H.'s internal organs, including the condition of his heart, and thus, S.H.'s blood alcohol content may have been "falsely elevate[d]." *Id.* at 305. Dr. Guzzardi specifically indicated "[i]f there was any alcohol in [S.H.'s] stomach or in the intestines and those were opened and the contents were transported to the heart, then it would falsely elevate the alcohol level." *Id.* He further indicated that "[a]lmost always the heart

- 24 -

blood [alcohol content] is higher than the femoral blood [alcohol content]."
*Id.* at 306.

Additionally, Dr. Guzzardi testified the blood specimen was not taken from S.H. until approximately 11 hours postmortem, and "[d]uring 11 hours there can be significant postmortem redistribution of alcohol....So, again, another potential source of falsely reported alcohol level." *Id.* at 305-06. Accordingly, Dr. Guzzardi opined that the test result setting S.H.'s blood alcohol content at .094% was "not reliable." *Id.* at 309.

J.G. testified that, in May of 2015, prior to the accident, she was a passenger in a car, which was being driven by S.H. *Id.* at 352. She indicated S.H. drove "very recklessly." *Id.* at 353. She noted that she advised S.H. that he should drive more safely, and she reminded him that he should not drink and drive. *Id.* at 354.

Additionally, J.G. testified that, on the day of the accident, she texted S.H. numerous times to determine what had happened to N.A. *Id.* She indicated she sent her last text to S.H. at 7:06 p.m., which was approximately three or four minutes before the accident occurred. *Id.* at 355-56.

L.J., who was fourteen years old at the time of the accident, testified that she used to date Appellant Tierney's son, S.T. *Id.* at 376-77. On June 15, 2015, she went to the Tierney house and "hung out" with S.T. in the afternoon. *Id.* at 377. She indicated that, at approximately 4:00 p.m., S.H.,

N.M., N.A., C.H., and D.G. "showed up" at the house, and they made food. *Id.* at 378.

At approximately 6:00 p.m., Appellant Tierney and her husband arrived home, and they made dinner for the teenagers. *Id.* at 379. L.J. indicated the teens swam in the pool and, when it became dark, they built a bonfire. *Id.* At approximately 9:00 p.m., S.H. and C.H. left to purchase alcohol, and when S.H. returned, he drove L.J. home at approximately 10:30 p.m. *Id.* at 380. She noticed no signs that S.H. was intoxicated. *Id.* at 382. L.J. noted that she originally intended to have Appellant Tierney or her husband drive her home; however, they were already asleep by 10:30 p.m. *Id.* at 381. The next day, L.J. saw S.T. at the high school at 7:00 a.m. *Id.* at 384.

Andrea Joines testified that L.J. is her daughter, and she observed no signs that S.H. was intoxicated when he drove L.J. home the evening of June 15, 2015. *Id.* at 522.

Appellant Tierney's son, S.T., testified that S.H. and N.M. were his "best friends," and they often stayed at his house. *Id.* at 395. He indicated S.H. and N.M. called his mother "Mama Jodes," and she treated them like a mother. *Id.* at 396. S.T. testified his basement had many entertainment features, including a ping-pong table, an air hockey table, a pool table, exercise equipment, a foosball table, furniture, and a video game system; thus, he and his friends enjoyed "hanging out" in his family's basement. *Id.* at 399-400.

S.T. estimated that, from December of 2014 to June 16, 2015, he and his group of friends (including S.H., N.M., N.A., D.G., and C.H.) spent 20 or 30 weekends at the Tierney residence. *Id.* at 403. S.T. testified that, in January of 2015, he and his group of friends began drinking alcohol at his house, as well as at other locations, and at least 20 times, S.H. brought beer. *Id.* at 409-10. S.T. indicated that any time S.H. was at the Tierney residence he would bring a case of beer. *Id.* at 411-12. He noted S.H. would carry it "either in a bag or put it through the [basement] window." *Id.* at 412. S.T. indicated they were trying to hide the alcohol from his parents. *Id.* at 415.

S.T. testified his parents often went to their cabin, and S.T. would stay home with his friends. *Id.* at 414. On these occasions, teenagers would bring alcohol to his house while his parents were gone. *Id.* S.T. estimated that he had "five parties" and "four times" his parents were not at the house. *Id.* The one time his parents were home S.T. took measures to hide the alcohol so that they would not be aware the teens were drinking. *Id.* at 415. S.T. testified that his friends were not supposed to be at his house when he was not home. *Id.* at 419.

S.T. admitted that, in April of 2015, Appellant Tierney purchased beer and allowed S.T., S.H., C.H., N.M., N.A., and D.G. to drink it in the Tierneys' basement. *Id.* at 420-21. S.T. indicated this is the only occasion Appellant Tierney was aware the teens were consuming alcohol at the Tierney residence, as the teens would generally hide the alcohol. *Id.* at 464.

Regarding the time S.T. and his friends went to the cabin with his parents, S.T. admitted that Appellant Tierney purchased a case of beer at a pizza shop; however, he denied the beer was for him and his friends. *Id.* at 424. Rather, she purchased the beer for the people who were renovating the cabin. *Id.* S.T. testified that, after they ate at the pizza shop, his parents went to bed while he and his friends walked to a nearby cabin where they consumed alcohol. *Id.* at 427. S.T. testified that his friends had brought alcohol to the cabin, but his parents were unaware of the alcohol and were not present when the teens consumed it. *Id.* at 424-28.

Regarding Mother's Day of 2015, S.T. denied that he saw any of his friends consuming alcohol at his house, he did not consume any alcohol, and he did not assist in any yardwork. *Id.* at 429. He admitted that, on June 15, 2015, he had his friends over to his house, and after his dad went to bed and Appellant Tierney was "dozing on the couch," he brought a bottle of rum into the basement without his parents' permission, and S.H. left at 9:30 p.m. to buy beer. *Id.* at 434-39. At approximately 10:45 p.m., S.T. went upstairs to ask Appellant Tierney to drive L.J. home; however, Appellant Tierney was already asleep. *Id.* at 435-36. Therefore, after S.H. returned to the Tierney residence, S.H. drove L.J. home; S.H. then came back to the Tierney residence for the night. *Id.* at 437-38. S.T. observed no signs that S.H. was intoxicated during this time. *Id.*

S.T. testified that the next day, on June 16, 2015, Appellant Tierney took him to the high school for cheer camp at approximately 6:30 a.m. while his friends, including S.H. and N.M., continued to sleep at his house. *Id.* at 443. S.T was under the impression that his friends would be leaving the house as they had football workouts at 8:00 a.m. *Id.* at 445.

At the conclusion of all evidence, the jury convicted Appellant Tierney of the offenses indicated *supra*.[7] On August 29, 2017, Appellant Tierney, represented by counsel, proceeded to a sentencing hearing at the conclusion of which the trial court imposed the following sentence: Count 1-endangering the welfare of children (S.H.)-12 to 24 months incarceration; Count 2-endangering the welfare of children (N.M.)-12 to 24 months incarceration, to be served consecutively to Count 1; Count 3-involuntary manslaughter (S.H.)-merged with Count 1; Count 4-involuntary manslaughter (N.M.)-merged with Count 2; Count 5-corruption of minors (S.H., N.M., D.G., N.A., and C.H.)-6 to 24 months incarceration, to be served consecutively to Count 2; and Count 6-selling or furnishing liquor or malt or brewed beverages to a minor (S.H., N.M., D.G., N.A., and C.H.)-12 months' probation, to be served consecutively to Count 5. Appellant Tierney filed a timely, counseled post-sentence motion, which the trial court denied on September 14, 2017.

---

[7] Appellant Tierney's husband entered a guilty plea to corruption of minors and selling or furnishing liquor to minors. The trial court sentenced him to an aggregate of thirty-six months of probation.

On September 25, 2017, the Commonwealth filed a timely notice of appeal. The trial court directed the Commonwealth to file a Pa.R.A.P. 1925(b) statement, and the Commonwealth timely complied. The trial court filed a responsive opinion on November 22, 2017.

On October 10, 2017, Appellant Tierney filed a timely cross-appeal,[8] and the trial court directed her to file a Pa.R.A.P. 1925(b) statement. Following the grant of an extension of time, Appellant Tierney timely complied. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion on April 13, 2018.

On appeal, the Commonwealth presents the following issue in its "Statement of the Questions Involved":

> Whether the trial court erred as a matter of law when it determined that the counts of involuntary manslaughter (Counts 3 and 4) merged with the counts of endangering the welfare of children (Counts 1 and 2) for sentencing purposes[?]

Commonwealth's Brief at 5.

In her cross-appeal, Appellant Tierney presents the following issues in her "Statement of the Questions Involved":

_____

[8] The Pennsylvania Rules of Appellate Procedure permit a party to file a cross-appeal within fourteen days of the date on which the first notice of appeal was served. Pa.R.A.P. 903(b). Here, the fourteenth day fell on Monday, October 9, 2017, which was a court holiday. Thus, Appellant Tierney timely filed her cross-appeal on Tuesday, October 10, 2017. *See* 1 Pa.C.S.A. § 1908 (noting that the computation of time excludes the first and last day of a period, and that when the last day of a period falls on a Saturday, Sunday, or legal holiday, that day may be omitted from computation).

1. Did not the lower court properly merge the charges of endangering the welfare of a child and involuntary manslaughter at sentencing?

2. Was not the evidence insufficient on involuntary manslaughter where [Appellant Tierney] did not furnish the alcohol consumed by the decedents before driving, and the minor decedents were drinking at [Appellant Tierney's] house while she was at work after telling her they had obligations that day?

3. Did not the lower court err when it allowed the Commonwealth to present the photographs of the decedents' burned bodies to the jury where those photos were not probative of any trial issue?

4. Did not the lower court err when it denied [Appellant Tierney's] motion for a new trial where the convictions of involuntary manslaughter and endangering the welfare of children [were] against the weight of the evidence, which tended to show [Appellant Tierney] did not furnish alcohol or fail to supervise and that the decedents were texting while driving?

5. Did not the lower court err when it denied [Appellant Tierney's] motion for a new trial where the conviction of endangering the welfare of children was against the weight of the evidence, which tended to show that [Appellant Tierney] was not aware that she was leaving minors unsupervised?

Appellant Tierney's Brief at 5-6.

Initially, we begin our analysis with Appellant Tierney's second appellate issue: whether the evidence was sufficient to sustain her convictions for involuntary manslaughter as to S.H. and N.M.[9]

When considering a challenge to the sufficiency of the evidence, the standard we apply is as follows:

_____

[9] The Commonwealth's sole appellate argument and Appellant Tierney's first appellate argument are interrelated and present a legality of sentencing claim. We shall address this matter in our final analysis *infra*.

> [W]hether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Johnson*, 192 A.3d 1149, 1155 (Pa.Super. 2018) (citation omitted).

"A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, [s]he causes the death of another person." 18 Pa.C.S.A. § 2504(a). Thus, "involuntary manslaughter requires 1) a mental state of either recklessness or gross negligence[,] and 2) a causal nexus between the conduct of the accused and the death of the victim." *Commonwealth v. Fabian*, 60 A.3d 146, 151 (Pa.Super. 2013) (citation omitted).

Relevantly, recklessness is defined as follows:

> A person acts recklessly with respect to a material element of an offense when [s]he consciously disregards a substantial and unjustifiable risk that the material element exists or will result

from h[er] conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to h[er], its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

With regard to the causation element of involuntary manslaughter, this Court has held the following:

> "Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death." **Commonwealth v. Nicotra**, 625 A.2d 1259, 1260 (Pa.Super. 1993) (citations omitted). This is true even though "other factors combined with that conduct to achieve the result." **Id....**.
>
> > In order to impose criminal liability, causation must be direct and substantial. Defendants should not be exposed to a loss of liberty based on the tort standard, which only provides that the event giving rise to the injury is a substantial factor. Although typically the tort context refers only to substantial and not to direct and substantial as in the criminal context, the additional language in the criminal law does not provide much guidance. Therefore, criminal causation has come to involve a case-by-case social determination; *i.e., is it just or fair under the facts of the case to expose the defendant to criminal sanctions. In other words, was the defendant's conduct so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability or was the actual result so remote and attenuated that it would be unfair to hold the defendant responsible for it?*
>
> **Commonwealth v. Rementer**, 598 A.2d 1300, 1304–05 (Pa.Super. 1991) (emphasis supplied)[.]
>
> In seeking to define the requirement that a criminal defendant's conduct be a direct factor in the death of another, the courts of this Commonwealth have held that "so long as the defendant's conduct started the chain of causation which led to the victim's death, criminal responsibility for the crime of homicide

may properly be found." A victim's contributory negligence is not a defense to a criminal charge.

***Commonwealth v. McCloskey***, 835 A.2d 801, 807 (Pa.Super. 2003) (quotations omitted).

Here, the Commonwealth presented the testimony of numerous minors who established that Appellant Tierney was aware that the minors were consuming alcohol at her house on a regular basis, including the night before the fatal accident, as well as the day of the fatal accident. "The evidence…establish[ed] that for months [Appellant Tierney] had fostered an atmosphere where the minors felt comfortable drinking alcohol and socializing while in her home." Trial Court Opinion, filed 4/13/18, at 36. The minors also indicated they, including S.H., routinely drove their cars to the Tierney residence, and despite the fact it was clear they were consuming alcohol, Appellant Tierney took few, if any, measures to secure their car keys or prevent them from driving away from her home.

The minors testified at length as to their drinking alcohol and "partying" during the evening of June 15, 2015, with Appellant Tierney present in the house. With S.H. and N.M. still asleep in her home, Appellant Tierney left the next morning (on June 16, 2015) and returned late in the afternoon to find one of the minor boys, N.A., so intoxicated that he was unconscious. When N.A.'s father came to retrieve him, Appellant Tierney's husband, who appeared to be nervous and scared, apologized for the condition of N.A., and

turning to Appellant Tierney, he said, "This has got to stop." N.T., 7/11/17-7/14/17, at 825-28. Appellant did not respond.

Further, C.H. testified he, as well as N.A., S.H., and N.M., had been drinking alcohol at the Tierney residence during the day on June 16, 2015, and they did not pick up the visible empty alcohol containers. "[D]espite obvious signs that the minors had been drinking," Appellant Tierney permitted S.H. to drive away from her home with N.M. as his passenger. Trial Court Opinion, filed 4/13/18, at 39. The fatal accident occurred as S.H. drove home.

Based on the aforementioned, we agree with the trial court that the evidence was sufficient to sustain Appellant Tierney's convictions for involuntary manslaughter as to S.H. and N.M. "The law prohibits anyone from knowingly furnishing liquor, malt or brewed beverages to persons less than 21 years of age. 'Furnishing' alcohol includes allow[ing] a minor to possess…[alcohol] on property owned or controlled by the person charged." *McCloskey*, 835 A.2d at 807 (citations omitted). Thus, the law is clear that Appellant Tierney was prohibited from allowing her son's guests, all of whom were minors, to possess alcohol in her home. *See id.*

> We are certain that a parent who knows alcohol is being served to minors in her home is acting recklessly when she allows the conduct to continue. That knowledge not only constitutes a gross deviation from the standard of conduct that a reasonable person would observe in [her] situation, it also constitutes a clear violation of the law.

*Id.*

Here, the evidence, when viewed as it must be in the light most favorable to the Commonwealth as verdict winner, establishes that Appellant Tierney knew alcohol was being served in her home and the minors were drinking it, particularly during the evening of June 15, 2015, as well as during the day on June 16, 2015. As a result, her recklessness was established. *See id.*

With regard to causation, Appellant Tierney's "furnishing" of alcohol to minors, including S.H., "started the chain of causation" that led to his death, as well as the death of his passenger, N.M. The record supports the finding that Appellant Tierney knew the minors were drinking alcohol, but she still permitted S.H. to drive away from her house with N.M. as his passenger on June 16, 2015.

"That teenagers, alcohol and automobiles can be and often is a fatal combination is not a novel concept. Strict and detailed laws reflect the legislature's recognition of this fact." *Id.* at 808. We conclude that the occurrence of the fatal automobile accident following S.H.'s unlimited consumption of alcohol in a wholly unsupervised atmosphere is neither "remote" nor "attenuated." *See id.* Further, we conclude it is not "unfair" or "unjust" to hold Appellant Tierney responsible under these facts, despite the existence of other factors that combined with her conduct to achieve the tragic result here. *See id.*

We note this is not a case where the defendant simply failed to supervise teens in her home at which alcohol was secretly being served. *See id.* Rather, on June 15 and 16, 2015, Appellant "furnished" alcohol to the minors under the plain language of the statute, and with obvious signs of consumption, she took no steps to prevent S.H. and N.M. from leaving her home on June 16, 2015. Accordingly, we find no merit to her claim the evidence was insufficient to sustain her convictions for involuntary manslaughter as to S.H. and N.M.

In her next issue, Appellant Tierney contends the trial court erred in permitting the Commonwealth to enter into evidence Exhibits 16 and 17, which are photographs depicting S.H.'s vehicle with two badly-burned bodies lying in the car. Appellant Tierney specifically contends the photographs were irrelevant, inflammatory, and unduly prejudicial. Appellant Tierney's Brief at 21.

Photographs of a deceased victim are not *per se* inadmissible. *Commonwealth v. Mollett*, 5 A.3d 291 (Pa.Super. 2010). The admission of such photographs is a matter within the discretion of the trial judge. *Id.*

> When the Commonwealth proffers photographic evidence of an alleged victim of crime, the trial court must engage in a two-part analysis in order to determine whether such evidence is admissible. First, a trial court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

***Commonwealth v. Murray***, 623 Pa. 506, 83 A.3d 137, 157 (2013) (citations omitted).

Here, in finding no merit to Appellant Tierney's claim, the trial court indicated the following:

> On August 31, 2016, trial counsel for [Appellant Tierney] filed a motion *in limine* requesting to have any photographs showing the decedents in their final rest be prohibited.
>
> [Appellant Tierney] argued that the photographs provide minimal legal benefit compared to the great likelihood that the juries' minds would be inflamed to [Appellant Tierney's] prejudice. In response, on December 27, 2016, during the hearing to address [Appellant Tierney's] pre-trial motion, the Commonwealth stated that it was their preference not to introduce the photographs that contained the view of the victims at final rest. However, if [Appellant] Tierney were to argue the location and identification of each victim, the Commonwealth asserted that the photographs may become relevant, and the Commonwealth may seek to introduce them. The issue was eventually reserved for trial.
>
> During the trial, on the cross-examination of Corporal Taylor, [Appellant Tierney] questioned the corporal regarding the location of the bodies. Immediately after, the Commonwealth requested a sidebar. During [the sidebar], the Commonwealth stated, "it appears now there is going to be an issue that's going to be raised, including as it relates to who was driving and who was a passenger. And that will go into [Deputy Coroner] Jeffri Goodfellow's determinations at the scene and her observations." [Appellant Tierney] argued that the photographs did not have any evidentiary value, and people could testify to the location of the bodies without seeing the pictures. Th[e] [trial] court disagreed.
>
> ***
>
> Although unquestionably unpleasant, the photographs depicting the burned bodies of the victims were relevant for the purpose of depicting the location of the bodies and ultimately who was driving the vehicle. [Appellant Tierney] called into question what victim was driving S.H.'s vehicle at the time of the crash. Therefore, th[e] [trial] court found the images had essential evidentiary value that outweighed any potential prejudice from their admission.

Trial Court Opinion, filed 4/13/18, at 50-53 (citations to record omitted).

We find no abuse of discretion in this regard. **See Mollett**, **supra**. Further, we note that, before the photographs were shown to the jury, the trial court took appropriate measures to insure that no prejudice would result from the photographs' admission. Specifically, the trial court gave an appropriate inflammatory photograph charge to the jury. **See** N.T., 7/10/17-7/14/17, at 209-10. It is well-settled that juries are presumed to follow the court's instructions. **Commonwealth v. Chmiel**, 612 Pa. 333, 30 A.3d 1111 (2011). Accordingly, we find Appellant Tierney is not entitled to relief on this claim.

In her next issue, Appellant Tierney claims the jury's verdicts for involuntary manslaughter are against the weight of the evidence.[10] Specifically, she avers the weight of the evidence reveals the fatal automobile accident was caused by S.H.'s texting and speeding while he was driving. She further avers that "[w]hile his drinking likely also contributed to the accident,

_____

[10] We note that, in her "Statement of the Questions Involved," Appellant Tierney phrases this issue to include a weight claim with regard to endangering the welfare of children. However, in the argument section of her brief, as to this issue, she develops a weight claim solely as to involuntary manslaughter. In any event, in her next issue, which is discussed *infra*, Appellant Tierney presents a separate weight claim with regard to her conviction for endangering the welfare of children.

Moreover, we note Appellant Tierney challenged the weight of the evidence in her post-sentence motion. **See** Pa.R.Crim.P. 607(A).

the evidence weighs towards the conclusion that Appellant [Tierney] was not responsible for that drinking, and moreover that it was purposefully hidden from her." Appellant Tierney's Brief at 26.

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Appellant Tierney requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, a task that is beyond our scope of review. To the extent there was conflicting evidence presented regarding S.H.'s texting and speeding, as well as Appellant Tierney's knowledge concerning S.H.'s alcohol consumption, the jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Simply put, the trial court did not abuse its discretion in concluding the jury's verdict is not against the weight of the evidence. *See Talbert*, *supra*.

In her next issue, Appellant Tierney claims the jury's verdicts for endangering the welfare of children are against the weight of the evidence.[11]

---

[11] In relevant part, endangering the welfare of children is defined as follows:
> A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1).

- 41 -

Specifically, she avers "the evidence weighs in favor of concluding that [the minors] were drinking without Appellant [Tierney's] knowledge, meaning that Appellant [Tierney] was not aware of the circumstances endangering them." Appellant Tierney's Brief at 28. She further avers the evidence reveals the minors were at her "house every weekend between December and June, roughly twenty-five weekends, but that they only consumed alcohol there on five occasions." *Id.* She argues "the evidence weighs in favor of concluding that her actions were reasonable given the age and relative sophistication of the minors and the steps they took to hide their alcohol use[.]" *Id.* at 27.

As with her previous weight of the evidence claim set forth *supra*, we conclude Appellant Tierney requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, a task that is beyond our scope of review. Simply put, the jury was free to believe, all, part, or none of the testimony, and the fact the jury chose to believe the testimony of the Commonwealth's witnesses does not render the jury's verdict against the weight of the evidence. *See Talbert*, *supra*. Accordingly, the trial court did not abuse its discretion in concluding the jury's verdict is not against the weight of the evidence. *See id.*

Finally, we address simultaneously the Commonwealth's sole appellate claim, as well as Appellant Tierney's first appellate claim, as they implicate the same issue: namely, whether the trial court erred in merging Appellant Tierney's convictions on two counts of involuntary manslaughter with her

- 42 -

convictions on two counts of endangering the welfare of children for sentencing purposes.

"A claim that crimes should have merged for sentencing purposes challenges the legality of a sentence[.]" **Commonwealth v. Duffy**, 832 A.2d 1132, 1136 (Pa.Super. 2003) (citation omitted). As such, our standard of review is *de novo* and the scope of our review is plenary. **Commonwealth v. Collins**, 564 Pa. 144, 764 A.2d 1056, 1057 n.1 (2001).

42 Pa.C.S.A. § 9765 provides the following:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. When crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765.

"The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Commonwealth v. Baldwin**, 604 Pa. 34, 985 A.2d 830, 833 (2009). The merger doctrine "is essentially a rule of statutory construction designed to determine whether the legislature intended for the punishment of one offense to encompass that for another offense from the same criminal act or transaction." **Commonwealth v. Williams**, 958 A.2d 522, 527 (Pa.Super. 2008) (citations omitted).

"The preliminary consideration is whether the facts on which both offenses are charged constitute one solitary criminal act. If the offenses stem from two different criminal acts, merger analysis is not required." ***Commonwealth v. Healey***, 836 A.2d 156, 157-58 (Pa.Super. 2003) (citation omitted).

We have explained:

> [T]he threshold question is whether [the] [a]ppellant committed one solitary criminal act. The answer to this question does not turn on whether there was a break in the chain of criminal activity. Rather, the answer turns on whether the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime[.] If so, then the defendant has committed more than one criminal act. This focus is designed to prevent defendants from receiving a volume discount on crime[.]

***Commonwealth v. Orie***, 88 A.3d 983, 1020 (Pa.Super. 2014) (quotation marks and quotation omitted).

Regarding the pertinent statutory provisions pertinent to the instant merger issue, to reiterate, "[a] person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, [s]he causes the death of another person." 18 Pa.C.S.A. § 2504(a). With regard to endangering the welfare of children, "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age,…commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1).

With these legal precepts in mind, we begin with an examination of whether the involuntary manslaughter convictions and endangering the welfare of children convictions arose out of the same criminal act. **See Orie**, **supra**. In doing so, we must examine whether Appellant Tierney's actions constituted a single criminal act, with reference to the charging documents, including the affidavit of probable cause, the criminal complaint, and the criminal information filed by the Commonwealth. **See Commonwealth v. Kimmel**, 125 A.3d 1272 (Pa.Super. 2015) (*en banc*) (examining documents, including criminal complaint, information, and affidavit of probable cause, to determine whether they delineate separate criminal acts, which were later reflected in the trial testimony, in concluding whether the Commonwealth established factual predicates to avoid merger). **See also Commonwealth v. Martinez**, 153 A.3d 1025 (Pa.Super. 2016) (same).

Here, the criminal information set forth in Counts 1 and 2 the offense of endangering the welfare of children, and in Counts 3 and 4, the offense of involuntary manslaughter. S.H. was specifically named as the victim in Counts 1 and 3, while N.M. was specifically named as the victim in Counts 2 and 4.

With regard to Counts 1 and 2, pertaining to endangering the welfare of children, the criminal information relevantly indicated Appellant Tierney committed "repeated violation" of "harboring, enabling or condoning an environment where illegal activity such as consumption of alcohol by minors was allowed, permitted, enabled, encourage or tolerated at [Appellant

Tierney's] residence." Criminal Information, filed 7/14/16, at 1. Counts 1 and 2 indicated that the culmination of these "repeated violations" was the single vehicle crash with S.H. driving while impaired after consuming alcohol at Appellant Tierney's residence.[12] *Id.*

With regard to Counts 3 and 4, pertaining to involuntary manslaughter, the criminal information relevantly indicated Appellant Tierney recklessly or in a grossly negligent manner caused the death of the named victim

> by violating a duty of care, protection, or support for [the named victim] where [S.H.] was driving while impaired after consuming alcohol at [Appellant Tierney's] residence…and subsequently crashed the motor vehicle he was operating while impaired, causing [the named victim's] death, and [Appellant Tierney] failed to prevent [S.H.] from operating a vehicle while impaired after consuming alcohol at [her] residence[.]

*Id.* at 1-2.

The affidavit of probable cause set forth at length a factual narrative underlying the involuntary manslaughter charges, particularly regarding the events occurring the night before and day of the fatal crash. Specifically, the narrative set forth S.H.'s consumption of alcohol at the Tierney residence during this time, Appellant Tierney's knowledge thereof, and Appellant Tierney permitting S.H. to drive away from her home with N.M. as a passenger on the day of the accident. *See* Affidavit of Probable Cause, filed 5/19/16, at 1-6.

---

[12] The criminal complaint also refers to Appellant Tierney's "repeated violations" with regard to endangering the welfare of S.H. and N.M. *See* Police Criminal Complaint, filed 5/19/16, at 1.

However, the affidavit of probable cause also set forth a factual narrative related to Appellant Tierney's "repeated violation" of endangering the welfare of S.H. and N.M. prior to the fatal accident. For instance, the affidavit of probable cause set forth in detail that, between January 2015 to June 2015, Appellant Tierney purchased alcohol for S.H. and N.M. to consume at her home on at least two occasions, and she often observed them consuming alcohol in her home. Further, Appellant Tierney took no steps to secure the minors' car keys or require them to spend the night after consuming the alcohol.

Based on the aforementioned, we conclude the charging documents and supporting documents of record describe the operative facts in such a way as to distinguish the specific conduct underlying the offenses of endangering the welfare of children and involuntary manslaughter, respectively. **See Kimmel**, **supra**. That is, we conclude the endangering the welfare of children charges and the involuntary manslaughter charges did not "arise from a single criminal act[;]" but rather, the offenses were based on two discrete criminal acts for purposes of avoiding merger at sentencing. 42 Pa.C.S.A. § 9765.

As the criminal information, complaint, and affidavit of probable cause reveal, Appellant Tierney was charged with committing "repeated violation" of the statute pertaining to endangering the welfare of children. **Orie**, **supra**. These "repeated violations" were "beyond that which is necessary to establish the bare elements of the additional crime [of involuntary manslaughter]." **Id.** at 1020. Accordingly, Appellant Tierney was charged with more than one

criminal act and she should not receive a "volume discount on crime[.]" ***Id.*** Consequently, we agree with the Commonwealth that the trial court erred in merging Appellant Tierney's convictions for involuntary manslaughter with her convictions for endangering the welfare of children.[13]

For all of the foregoing reasons, we affirm Appellant Tierney's convictions, but we vacate her judgment of sentence and remand for resentencing.

Judgment of sentence vacated. Case remanded solely for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/22/2019

---

[13] In light of this conclusion, it is unnecessary for us to determine whether "all of the statutory elements of [involuntary manslaughter] are included in the statutory elements of [endangering the welfare of children]." 42 Pa.C.S.A. § 9765.